IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|                                    |   |                         |
|------------------------------------|---|-------------------------|
| BENJAMIN CRUMP,                    | ) |                         |
|                                    | ) |                         |
| Petitioner,                        | ) |                         |
|                                    | ) |                         |
| v.                                 | ) | C.A. No. 19-2105 (MN)   |
|                                    | ) |                         |
| ROBERT MAY, Warden, and            | ) |                         |
| ATTORNEY GENERAL OF THE STATE      | ) |                         |
| OF DELAWARE,                       | ) |                         |
|                                    | ) |                         |
| Respondents.                       | ) |                         |

## **MEMORANDUM OPINION**


Benjamin Crump – *Pro se* Petitioner.

Brian L. Arban, Deputy Attorney General, Delaware Department of Justice, Wilmington, DE –
Attorney for Respondents.


February 27, 2023
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE**

Pending before the Court is Petitioner Benjamin Crump's ("Petitioner") authorized second Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition").  (D.I. 2).  The State filed an Answer in opposition, to which Petitioner filed a Reply.  (D.I. 10; D.I. 17).  For the reasons discussed, the Court will deny the Petition as second or successive.

## I.   BACKGROUND

### A.   Facts[1]

On November 23, 1981, the thirteen-year-old victim was leaving the Clifton Park Community Center ("Community Center") with her friend on her way to her home in the Clifton Park Apartment complex, when a man emerged from the bushes and bumped into the victim.  After excusing himself, the man bumped into the victim again, and grabbed her. The victim's friend screamed and fled the scene.  The assailant dragged the victim, kicking and screaming, into a vacant apartment in the complex, where he raped her.  After the assailant fled the scene of the rape, the victim returned to the Community Center and recounted the incident to an employee of the Center.  The victim was treated at a hospital, and later gave a tape-recorded statement to the police, which included a description of her assailant.  At that time, the victim could not identify a picture of her assailant in any of the photo books.  After awakening later that night from a nightmare, the victim drew a sketch of her attacker, but she could not identify him in any of the photo books with which she was subsequently presented.  In January of 1983, the victim was shown a photo spread comprising of approximately forty photographs, including one of Petitioner.  Petitioner had been identified as a suspect in several other rapes that had occurred in the vicinity of the attack in this case.  The victim indicated that Petitioner looked like her assailant, except that the assailant's eyes

---

[1]   The facts are from the Honorable Joseph J. Farnan's Memorandum Opinion denying Petitioner's first habeas petition in 1991.  (*See* D.I. 4-1 at 14-19).

were darker.  At trial, the victim again identified Petitioner as the man who had raped her.  During the prosecution's redirect examination of the victim, the prosecutor sought to introduce portions of the transcript prepared from the tape-recorded statement that the victim had given to the police following the rape.  Petitioner objected based on the Best Evidence Rule.  The prosecutor testified that the tape had since been erased and used again during the three-year interim for other purposes, pursuant to standard police department procedure. The court permitted the transcript to be introduced into evidence, concluding that it was permissible under the Best Evidence Rule.  During cross-examination of the victim at trial, she admitted that although she had no clear independent recollection of the tape-recorded statement, she had reviewed the transcript of the statement and had corrected several answers which were "incorrect."  The victim indicated that the answers were incorrect because they did not match her present recollection of the rape.  This "corrected" version of the transcript was also admitted into evidence.  In addition to the victim's identification of Petitioner as her attacker, the State offered hair analyses at trial which showed that Petitioner's hair had the same twenty characteristics as the victim's assailant.  In rebuttal, Petitioner claimed that he had never seen the victim, and that he had never been to the Community Center.  Petitioner also testified that at the time of the attack, he had been moving furniture between his old apartment and his girlfriend's apartment, who lived in the same apartment complex as the victim. The jury rejected Petitioner's alibi defense and found him guilty of kidnapping and forcible rape.

     **B.**    **Procedural History**

On June 19, 1984, a Superior Court jury convicted Petitioner of first-degree kidnapping and first-degree rape.  (D.I. 11-1 at Entry Nos. 12, 14).  The Superior Court sentenced Petitioner to two consecutive terms of life imprisonment.  (D.I. 11-1 at Entry No. 15).  Petitioner appealed, and the Delaware Supreme Court affirmed his convictions on September 6, 1985.  *See Crump v. State*, 505 A.2d 452 (Table), 1985 WL 188342 (Del. Sept. 6, 1985).

Petitioner filed his first motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion") on March 31, 1988.  (D.I. 11-1 at Entry No. 31).  The Superior Court denied Petitioner's Rule 61 motion on October 18, 1998.  *See State v. Crump*, 1988 WL 109381, at *4 (Del. Super. Ct. Oct. 18, 1988).  The Delaware Supreme Court affirmed that decision on August 21, 1989.  *See Crump v. State*, 567 A.2d 420 (Table), 1989 WL 114290, at *1 (Del. Aug. 21, 1989).  On November 30, 1989, Petitioner filed a federal habeas petition in this Court, which the Honorable Joseph J. Farnan denied on July 2, 1991.  (D.I. 4-1 at 13-24).

In 1996, the Innocence Project ("the Project") began assisting Petitioner.  *See State v. Crump*, 2017 WL 6403510, at *1 (Del. Super. Ct. Dec. 14, 2017).  On February 28, 2000, the Project filed a motion in the Superior Court to release evidence from Petitioner's trial for testing, which the court granted on March 8, 2000.  (D.I. 11-1 at Entry Nos. 51, 52).  Forensic Science Associates, on behalf of the Project, reviewed the FBI Special Agent's report and testimony regarding his hair comparison analysis and conducted DNA testing on a comb with pubic combings from the victim.  D.I. 11-18 at 51-54, 98-99; *see Crump*, 2017 WL 6403510, at *1.  In April 2003, the scientists submitted a report identifying several issues of concern with the FBI Agent's report and testimony on the hair analysis, at one point stating, "At best [the Agent's] testimony . . . is a gross distortion of the scientific capacity of microscopic hair examinations to distinguish between the hairs of individuals."  (D.I. 11-18 at 51-54).  The 2003 report also concluded that Petitioner's claims of factual innocence were unsupported because Petitioner was the contributor of the spermatozoa's DNA on the comb.  D.I. 11-18 at 98-99; *see Crump*, 2017 WL 6403510, at *1, 3.

In a letter dated September 12, 2014, the United States Department of Justice ("USDOJ") advised Petitioner that the FBI Special Agent's trial testimony regarding hair analysis was

problematic and provided a copy of the Independent Scientific Review performed for his case. (D.I. 11-18 at 118-21).   In a letter dated September 30, 2014, the USDOJ sent a letter to the Delaware Department of Justice stating that it had determined that the FBI Agent's testimony "regarding microscopic hair comparison analysis contain[ed] erroneous statements" and "exceeded the limits of science and were therefore, invalid." (D.I. 11-18 at 132-33).   On May 15, 2015, the USDOJ sent another letter to Petitioner, enclosing a copy of the September 30, 2014 letter it had sent to the Delaware Department of Justice.   (D.I. 11-18 at 135).

On June 12, 2015, Petitioner, acting *pro se*, filed a second Rule 61 motion in which he raised claims of the FBI Special Agent's improper testimony and ineffective assistance of trial counsel in failing to challenge that expert's testimony.   (D.I. 11-1 at Entry No. 57).   The Superior Court appointed postconviction counsel to assist Petitioner.   (*Id*. at Entry No. 59).   On January 3, 2017, postconviction counsel filed a motion to withdraw his representation of Petitioner, stating that, after thoroughly reviewing the record, he could not find any claims that he could ethically advocate for Petitioner.   (D.I. 11-16).   On December 14, 2017, following responses from the State and Petitioner, the Superior Court denied Petitioner's second Rule 61 motion as untimely under Delaware Superior Court Criminal Rule 61(i)(1) and procedurally barred as repetitive under Rule 61(d), and granted postconviction counsel's motion to withdraw.   *See Crump*, 2017 WL 6403510, at *3.   On August 7, 2018, the Delaware Supreme Court affirmed the Superior Court's judgment.   *See Crump v. State*, 194 A.3d 16 (Table), 2018 WL 3769261, at *1 (Del. Aug. 7, 2018).   Petitioner subsequently petitioned the United States Supreme Court for a writ of certiorari, which was denied on March 25, 2019.   *See Crump v. Delaware*, 139 S. Ct. 1400 (2019).

## II.   PETITIONER'S SECOND AND SUCCESSIVE PETITION

On September 3, 2019, Petitioner filed in the Third Circuit Court of Appeals an application for leave to file the instant second federal habeas Petition and a memorandum in support of the

petition. (D.I. 2; D.I. 4). On September 19, 2019, the Third Circuit granted Petitioner leave to file the Petition, and transferred the Petition to be filed in this Court. (D.I. 1 at 1). The Third Circuit's order explains that its decision to authorize Petitioner's filing of a second or successive petition "represents only a prima facie determination that Petitioner's proposed § 2254 petition is not an abuse of the writ." (*Id*.). The Third Circuit's order is not dispositive or indicative of the merits of the instant Petition. Rather, the Third Circuit expressly states that, "[i]f the District Court determines that the petition is abusive of the writ and that Petitioner cannot alternatively satisfy the standards of 28 U.S.C. § 2244(b)(2)(B), the District Court must dismiss Petitioner's § 2254 petition." (D.I. 1 at 1).

The State contends that the Petition should be dismissed for lack of jurisdiction for failing to satisfy the requirements of § 2244(b)(2)(B)(ii), without addressing the abuse of the writ doctrine. The State also asserts that the Petition is time-barred under § 2244(d) and procedurally barred. Following the Third Circuit's express guidance, however, the Court will focus on whether the Claims are an abuse of the writ and, if not, whether Petitioner can satisfy the requirements of § 2244(b)(2)(B).

## III. **ABUSE OF THE WRIT DOCTRINE**

Prior to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the "doctrine of abuse of the writ define[d] the circumstances in which federal courts decline to entertain a claim presented for the first time in a second or successive petition for a writ of habeas corpus." *Goldblum v. Klem*, 510 F.3d 204, 216 (3d Cir. 2007); *see also In re Minarik*, 166 F.3d 591, 595 (3d Cir. 1999). Under this doctrine, "a petitioner could prosecute another such petition only if he could (1) show cause for, and prejudice from, the omission of his new claim or claims from his earlier petition (*i.e.*, that his proceeding would not constitute an 'abuse of the writ'), or (2) demonstrate 'actual innocence.' *Id*. at 215.

Cause requires a showing of some external impediment preventing counsel from constructing or raising the claim. The question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process. Accordingly, if what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what he does not know is irrelevant. Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim.

Once the petitioner has established cause, he must show actual prejudice resulting from the errors of which he complains. Actual prejudice means not merely that the errors at trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.

Even if a petitioner cannot show cause and prejudice, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim. A court, however, should exercise this authority only in a narrow class of cases, *i.e.*, in extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.

*Goldblum*, 510 F.3d at 215–16 (cleaned up).

AEDPA's "substantive standards governing the allowance of second or successive applications [§ 2244(b)] are more rigorous than the pre-AEDPA standard." *Minarik*, 166 F.3d at 595. The Third Circuit has held that, in cases where the petitioner's first petition was filed before the enactment of AEDPA, courts must engage in a case specific inquiry to determine whether the application of AEDPA's new gatekeeping mechanism – § 2244(b) – would have an impermissible retroactive effect. *See Minarik*, 166 F.3d at 600. In other words, if the petitioner "can show that he would have been entitled to pursue his second petition under pre-AEDPA law, then the [. . .]

6

default rule prohibits applying AEDPA's new substantive gatekeeping provisions to bar his claims. In the absence of such a showing, [. . .] the AEDPA standard must be applied."[2]  *Id*. at 602.

## IV.    AEDPA'S SECOND OR SUCCESSIVE REQUIREMENTS

Pursuant to 28 U.S.C. § 2244(b)(4), "[a] district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant satisfies the requirements of this section."  The requirements relevant to this case are:

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

---

[2]    The Third Circuit articulated this two-step procedure as follows:

> we must be mindful that [the petitioner's] initial § 2254 habeas petition was filed in 1995, before AEDPA was enacted. Because application of § 2244(b) would have a retroactive effect upon [the petitioner] if it foreclosed habeas review that would have been available under the pre-AEDPA abuse of the writ doctrine, we must apply pre-AEDPA law and determine whether [the petitioner's] claim was raised in an earlier habeas petition.  If so, the claim would have been barred and we may apply § 2244(b)'s gatekeeping provisions to [the petitioner's] most recent filings.  If [the petitioner's] claim is new, however, we must determine whether [the petitioner] has demonstrated cause and prejudice for failing to present it in the state court.  In the absence of such a showing, however, the AEDPA standard must be applied.

*Diventura v. Wynder*, 325 F. App'x 71, 74 (3d Cir. 2009).  The Third Circuit further stated, "the cause and prejudice standard also may be satisfied if the petitioner can demonstrate that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey v. Zant*, 499 U.S. 465, 495 (1991). This requires a showing that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

28 U.S.C. § 2244(b)(2)(B).  Section 2244(B)(2)(b)(ii)'s "evidence as a whole" provision means "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  *House v. Bell*, 547 U.S. 518, 538 (2006); *see also Munchinski v. Wilson*, 694 F.3d 308, 336-37 (3d Cir. 2012).

The Supreme Court has explained the difference between the "miscarriage of justice" exception in the abuse of the writ doctrine and § 2244(b)(2)(B)(ii)'s "clear and convincing" evidence standard as follows:

> Congress did not simply incorporate the miscarriage of justice exception into §§ 2244(b)(2)(B) and 2254(e)(2).  Rather, Congress constrained the application of the exception.  Prior to AEDPA's enactment, a court could grant relief on a second-or-successive petition, then known as an "abusive" petition, if the petitioner could show that "a fundamental miscarriage of justice would result from a failure to entertain the claim."  Section 2244(b)(2)(B) limits the exception to cases in which "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," and the petitioner can establish that no reasonable factfinder "would have found [her] guilty of the underlying offense" by "clear and convincing evidence."  Congress thus required second-or-successive habeas petitioners attempting to benefit from the miscarriage of justice exception to meet a higher level of proof ("clear and convincing evidence") and to satisfy a diligence requirement that did not exist prior to AEDPA's passage.

*McQuiggin v. Perkins*, 569 U.S. 383, 395–96 (2013).

## V.     DISCUSSION

Petitioner's second habeas Petition asserts two grounds for relief.  In Claim One, Petitioner contends that he is entitled to a new trial because the FBI Special Agent was a material witness and his perjured testimony regarding microscopically matching hair evidence obtained from the victim and Petitioner violated Petitioner's due process rights.  (D.I. 2 at 5; D.I. 4 at 11-15).  In Claim Two, Petitioner asserts that, pursuant to *State v. Hubbard*, 2011 WL 4965286 (Del. Super. Ct. Sept. 29, 2011), there was insufficient evidence to support his conviction for first degree

kidnapping because the State failed to prove the elements of "harm" and "release."  (D.I. 2 at 7; D.I. 4 at 18-27).

### A.   Claim One: FBI Special Agent's Testimony

In Claim One, Petitioner contends that the USDOJ's May 15, 2015 letter demonstrates that the FBI Special Agent's testimony on the microscopic hair analysis comparison constituted perjury, thereby establishing that his conviction was obtained in violation of his due process rights. In his first petition, Petitioner did not argue that the Agent's testimony constituted perjury or that the admission of the testimony violated his due process rights.[3]  Consequently, Claim One is new.

---

[3]     Although the Court concludes that Petitioner could not have discovered that the Agent's testimony was flawed in the manner identified by the USDOJ prior to receiving the May 2015 letter, Petitioner did consistently challenge the reliability of the Agent's testimony.  For instance, on direct appeal, Petitioner argued there was insufficient evidence to support his conviction, premised in part on his argument that the expert's testimony was "suspect" and "based on a science that is simply not exact."  (D.I. 11-3 at 29-30).  In his first Rule 61 motion, Petitioner argued that that defense counsel was ineffective for not objecting to the Agent's hair comparison analysis testimony or presenting testimony from another expert about the unreliability of hair comparisons.  *See State v. Crump*, 1988 WL 109381, at *1 (Del. Super. Ct. Oct. 18, 1988).  The Superior Court determined that Petitioner was not prejudiced because the Agent conceded on cross-examination that "hair comparison does not constitute a basis for positive personal identification."  *Id*. at *3.  In his first federal habeas petition, Petitioner argued that defense counsel was ineffective for failing to present expert testimony on the unreliability of hair samples as identification.  (D.I. 11-13 at 11).  Judge Farnan denied that argument, opining:

> [I]f by this argument [Petitioner] means to imply that counsel failed to discredit the testimony of the agent, the Court concludes that this argument is without merit as well.  The Court finds that counsel vigorously attacked the reliability of the hair sample evidence in question on cross-examination. In particular, counsel was successful in getting the agent to admit that hair sample analysis is not as positive an identification as a fingerprint.
>
> As to [Petitioner's] contention that counsel should have presented expert testimony on the unreliability of hair samples for personal identification purposes, the Court first notes that counsel was able to elicit a concession to this effect on cross-examination ("hair comparison does not constitute a basis for positive personal identification.").  In fact, counsel's entire cross-examination of the agent called into question the reliability of hair samples as a method of positive identification.  The Court concludes that petitioner

Given the circumstances surrounding the USDOJ's "review of microscopic hair comparison reports and testimony presented by the FBI Laboratory before December 31, 1999," the Court concludes that Petitioner could not have discovered the information contained in the USDOJ's letter earlier through the exercise of due diligence.[4]   Therefore, he has established cause for not presenting Claim One in his first petition.  (*See* D.I. 11-18 at 132-33).

Having determined that Petitioner established cause, the Court must consider whether he can show prejudice.  Petitioner asserts that the Agent was a material witness and, therefore, any evidence that discredits the Agent's testimony is material because the hair analysis testimony was the primary evidence of identification.  The Court cannot dispute that the Agent's hair analysis testimony played an important role in the identification of Petitioner.  Indeed, the State's closing argument discussed the importance of the hair comparison evidence to identify Petitioner.  (D.I. 11-12 at 28-29).   Nevertheless, on cross-examination, the Agent acknowledged that hair comparison does not constitute a basis for positive personal identification, and testified that, "we don't want to mislead anybody into thinking a hair is a fingerprint."  (D.I. 11-17 at 51).  This

---

has failed to demonstrate that counsel's performance fell below an objective standard of reasonableness.

(D.I. 11-13 at 15-16).  Although Petitioner's ineffective assistance of counsel argument in his first petition and his perjury/due process argument in this proceeding both challenge the reliability of the Agent's testimony and the effect the unreliable testimony had during the guilt phase of Petitioner's trial, the differences between the two are enough to find that Claim One in this proceeding is a new claim.

[4]   The Court notes that the USDOJ did send a letter to Petitioner on September 12, 2014 informing him in general terms about the problems with the Agent's testimony.  Petitioner contacted the public defender's office at that time, and it even appears that he drafted a *pro se* Rule 61 motion in September 2014 concerning the information provided by the USDOJ. (D.I. 11-18 at 118-19).  These events do not alter the Court's determination that Petitioner has demonstrated cause for not raising Claim One in his first petition, because he still did not have the relevant information concerning the "newly discovered evidence" until long after his first habeas petition was denied.

concession put the jury on notice that the Agent's testimony was not completely definitive with respect to identifying Petitioner as the victim's assailant.   During closing, defense counsel reiterated the Agent's testimony, stating:

> And then by a special paragraph, so there can be no misunderstanding, it's pointed out that hair comparisons do not constitute a basis for positive person identification.   Does not constitute a basis for positive personal identification.   Now, that just can't be any clearer.  If you believe the FBI, then you cannot believe, under the proper legal standards, that [Petitioner] is the person who committed the alleged rape.

(D.I. 4-1 at 16, 79).  The trial court instructed the jury that "the testimony of an expert is to be tried like other testimony, receive as much weight and credit as you think it is entitled to receive when you view it in connection with all the other evidence in the case."  (D.I. 4-1 at 98).  All of these facts demonstrate that, despite the Agent's conclusions regarding the hair analysis, the jury was aware that the Agent's conclusions did not necessarily constitute a positive identification of Petitioner.

The jury was also presented with the victim's testimony identifying Petitioner as her attacker and validating the transcript of her  police interview on November 23, 1981 that was taped the same night of the rape.  Petitioner testified, presented his alibi, and stated that he had never seen the victim before.   The jury's verdict demonstrates that they rejected Petitioner's alibi testimony.

In sum, even if the jury had been presented with the USDOJ's determination regarding the invalidity of the Agent's testimony, the Court concludes that a rational juror could have found Petitioner guilty of rape based upon the victim's testimony.  Consequently, Petitioner has failed to demonstrate prejudice, because he has not shown that the Agent's testimony worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.

Having concluded that Petitioner did not demonstrate prejudice, the Court must determine whether Petitioner has shown that the dismissal of his Petition would result in a fundamental miscarriage of justice.  This is a difficult standard to satisfy, and the Supreme Court has advised that review should be granted under this exception only in "extraordinary instances." *McCleskey*, 111 S.Ct. at 1470.  The Court concludes that this case is not one of those instances.

The Third Circuit established a two-step inquiry for deciding claims of actual innocence. *See Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004); *Goldblum*, 510 F.3d 204, 225 (3d Cir. 2007) (reaffirming two-step inquiry).  First, a court must decide "whether the [petitioner] has presented new reliable evidence . . . not presented at trial." *Hubbard*, 378 F.3d at 340.  "New reliable evidence" includes "exculpatory, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Schlup*, 513 U.S. at 324.  Second, if the petitioner presents "new evidence not considered by the jury," then a court must determine "whether it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Hubbard*, 378 F.3d at 340.

Petitioner's new evidence is the USDOJ's determination that the following three categories of the Special Agent's testimony exceeded the limits of science: (1) "the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others;" (2) "the examiner assigned to the positive association a statistical weight or probability or provided a likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association;" or (3) "the examiner cites the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual." (D.I. 11-12 at 17).  The Court

presumes that the USDOJ's determination that the Agent's testimony "exceeded the limits of science and [was], therefore, invalid" constitutes new reliable evidence, and it definitely was not presented at trial.  Therefore, Petitioner has satisfied the first step of the actual innocence inquiry.

In order for Petitioner to satisfy the second step, the Court must be persuaded that, in light of the old evidence presented at trial and the new evidence presented here (the USDOJ's letter and determination), no juror acting reasonably would have voted to find Petitioner guilty of rape. Petitioner does not satisfy this standard.  At trial, the FBI Special Agent testified as an expert witness for the State about his conclusions from performing microscopic hair comparison analysis. On the victim's jacket, the Special Agent found a "dark brown pubic hair of Negroid origin." (D.I. 11-17 at 42).  The Special Agent "compared that pubic hair to the hairs of [Petitioner]" and determined that "they microscopically matched."  (*Id*.).  The Special Agent also found "twenty characteristics in that unknown pubic hair which were arranged in exactly the same manner as the characteristics in [Petitioner's] pubic hairs."  (D.I. 11-17 at 43).  On the victim's knit cap, the Special Agent found "a dark brown Negroid head hair" that "microscopically matched the head hairs of [Petitioner]."  (*Id*.).  Similar to the pubic hairs, the Special Agent found that the unknown head hair and Petitioner's head hair shared twenty characteristics arranged in the same manner. (D.I. 11-17 at 44).  Over defense counsel's objection, the Special Agent stated that he had compared hairs from 10,000 individuals and had only encountered two occasions in which two individuals had the same type of hair characteristics and he could not distinguish them.  (D.I. 11-17 at 44-45).  The Special Agent claimed that he had never "had an occasion where [he] had a head hair and a pubic hair from one person and [he] could not distinguish it from any other person." (D.I. 11-17 at 45).

Nevertheless, the Special Agent also made multiple concessions about the limits of microscopic hair comparison analysis. During defense counsel's cross-examination, the Special Agent conceded that hair comparison analysis was not like a fingerprint and that "no two hairs are what we call identical." (D.I. 11-17 at 47). The Special Agent also acknowledged that "a person may have hair which is not unique in the population." (D.I. 11-17 at 48). During further cross-examination, the Special Agent conceded that he "cannot positively make a personal identification from the samples that [he] had." (D.I. 11-17 at 56). During redirect examination, the Special Agent noted that his report contained a disclaimer that microscopic hair comparison analysis was not a means for personal identification because the FBI did not want people "to think it's like a fingerprint" and that "[w]hen [the FBI] match[es] a hair to a particular person, it's a very strong association but, again, it's not a fingerprint, so [the FBI] do[es not] want to mislead anybody." (*Id*.).

Also at trial, the jury was presented with the victim's testimony and positive in-court identification of Petitioner. The jury was aware of the lapse of time between the rape itself and the victim's identification of Petitioner through a photograph array. (D.I. 4-1 at 50-52). The jury heard in great detail the victim's validation of the transcript of her original tape-recorded police statement from November 23, 1981 – the same night of the rape – and her identification of certain errors in that statement fifteen months later during the trial. (D.I. 11-9 at 4-5, 20-27). The jury also heard Petitioner's testimony that he had never seen the victim before and his alibi that he had been moving furniture between his old apartment and his girlfriend's apartment, who lived at the same apartment complex as the victim. (D.I. 4-1 at 16).

The Court is faced with the following question: "[i]n the context of a reasonable juror's review of all the evidence, is [the USDOJ's identification of the errors in the Agent's testimony]

so persuasive and exculpatory that all 12 members of a jury who voted to convict [Petitioner] of rape would now change their minds to the end that it is more likely than not that none of them would vote to convict?"  *Goldbum*, 510 F.3d at 227.  Based on the Court's review of the record provided for Petitioner's trial, even if the jury had been presented with the USDOJ's determination regarding the invalidity of the Agent's testimony, the Court concludes that a rational juror could have found Petitioner guilty of rape based upon the victim's testimony.  When considered with the victims' testimony, the errors with the Agent's testimony do not rise to "a colorable showing of factual innocence" necessary to show a fundamental miscarriage of justice.

Thus, since Petitioner cannot establish prejudice or a miscarriage of justice under pre-AEDPA law, the Court must apply the gatekeeping provision in § 2244(b) to determine if Petitioner can proceed with Claim One.  *See Min*arik, 166 F.3d at 602.

### 1.     Section 2244(b)(2)(B)(i)

Given the circumstances behind the USDOJ's September 12, 2014 and May 15, 2015 letters to Petitioner, the Court finds that Petitioner could not have discovered the factual predicate for the claim previously through the exercise of due diligence.  As a result, Petitioner satisfies § 2244(b)(2)(B)(i).

### 2.     Section 2244(b)(2)(B)(ii)

Pursuant to § 2244(b)(2)(B)(ii), a petitioner seeking to have the merits of his second or successive petition considered must demonstrate his actual innocence under a higher level of proof than that required to establish actual innocence in other habeas contexts, such as procedural default and the statute of limitations.  *See generally McQuiggin*, 569 U.S. 383 (statute of limitations context); *Schlup*, 513 U.S. 298 (procedural default context); *Calderon v. Thompson*, 523 U.S. 538, 558 (1998) ("It is true that the miscarriage of justice standard . . . [for purposes of recalling a mandate] is somewhat more lenient than the standard in § 2244(b)(2)(B).").  To establish actual

innocence, a petitioner must put forth "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial and that proves that no reasonable juror would have voted to find him guilty beyond a reasonable doubt." *Hubbard v. Pinchak*, 378 F3d 333, 339-40 (3d Cir. 2003). Demonstrating actual innocence is "a burdensome task," *Satterfield v. Dist. Att'y Philadelphia*, 872 F.3d 152, 163 (3d Cir. 2017), and merely repackaging the existing trial record, *Hubbard*, 378 F.3d at 341, or asserting conclusory claims of actual innocence, *Couch v. Phelps*, 671 F. Supp. 2d 559, 562 (D. Del. 2009), is insufficient to meet this standard.

Petitioner contends that his conviction violated the due process clause because it was based on the FBI Special Agent's perjured testimony, with the falsity of the testimony being demonstrated by the USDOJ's May 2015 letter. In order to satisfy § 2244(b)(2)(B)(ii), Petitioner must show that, after considering the newly discovered additional evidence of the errors in the FBI Special Agent's testimony with all the evidence in the record, no reasonable factfinder would have convicted him. *See House*, 547 U.S. at 538.

In determining whether Petitioner can satisfy § 2244(b)(2)(B)(ii), the Court incorporates its prior discussion of the evidence as set forth in its discussion of the miscarriage of justice exception to the abuse of the writ doctrine. *See supra* at Section V. A. Additionally, however, the Court considers evidence in Petitioner's record that was obtained after his conviction and the dismissal of his first habeas petition.[5]  Notably, sometime between 2000 and 2003, Forensic

---

[5]   Nothing in the plain language of § 2244(b)(2)(B)(ii) limits the Court's inquiry regarding the facts underlying the claim to evidence offered by Petitioner. *See House*, 547 U.S. at 538 (the phrase "evidence as a whole" includes "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."); *see also Munchinski*, 694 F.3d at 337-39. In fact, the 2003 Forensic Science Associates report that the Court considers under § 2244(b)(2)(B)(ii) was written at the behest of the Innocence Project on Petitioner's

Science Associates, on behalf of the Innocence Project, extracted a DNA profile from spermatozoa found on a comb used for the victim's pubic combing and compared the profile to the one obtained from Petitioner's oral swab. *See Crump*, 2017 WL 6403510, at *1. Forensic Science Associates concluded in its 2003 report that Petitioner "cannot be eliminated as the source of the spermatozoa recovered from the tines of the [victim's] pubic comb," and stated that "these findings fail to support [Petitioner's] claims of factual innocence." (D.I. 11-18 at 98). Although Petitioner contends that the DNA evidence tested by Forensic Science Associates was possibly contaminated, his assertions are speculative. (*See* D.I. 17 at 2-3). In short, the DNA test results from April 2003 link Petitioner to the crimes of conviction and undermine his claims of innocence.

Thus, after considering the totality of the evidence in Petitioner's record at the time of his filing the instant Petition, the Court concludes that the USDOJ's determination regarding the Agent's testimony does not prove clearly and convincingly that no reasonable juror would have voted to find Petitioner guilty beyond a reasonable doubt. Therefore, Claim One must be dismissed as successive.

### B.      Claim Two: Insufficient Evidence of First Degree Kidnapping

In Claim Two, Petitioner contends that the Delaware decision *Hubbard* shows that there was insufficient evidence to convict him of first-degree kidnapping because the victim was released unharmed as a matter of law. Claim Two's argument concerning the State's failure to prove the elements of harm and "no release" is new. It was not presented in Petitioner's first petition and, therefore, under pre-AEDPA law, he may only proceed with Claim Two if he

---

behalf. The report addresses the validity of the Agent's testimony (D.I. 11-18 at 51-54) and Petitioner's allegation of actual innocence (D.I. 11-18 at 98-99), and, therefore, addresses the constitutional error that Petitioner alleges occurred at trial.

demonstrates cause and prejudice for failing to raise it in his earlier petition, or that a miscarriage of justice will occur if the Claim is not considered.

To the extent Petitioner attempts to establish cause by asserting that the argument in Claim Two was unavailable until the Superior Court decided *Hubbard* in 2011, the attempt is unavailing. Although the *Hubbard* decision itself was only issued in 2011, Petitioner always had the ability to argue that the State did not prove all of the elements of first degree kidnapping. In other words, the underlying insufficient evidence argument was available – Petitioner just failed to raise it during his trial, on direct appeal, in his first Rule 61 proceeding, or in his first federal habeas petition.

Petitioner also cannot demonstrate that a fundamental miscarriage of justice would result from a failure to entertain his argument regarding *Hubbard*. Petitioner's argument that the evidence presented at trial was legally insufficient to convict him fails to demonstrate his factual innocence. *See Bousley v. United States*, 523 U.S. 614, 623 (1998).

Thus, since Petitioner cannot establish prejudice or a miscarriage of justice under pre-AEDPA law, the Court must apply the gatekeeping provision in § 2244(b) to determine if Petitioner can proceed with Claim Two. *See Minarik,* 166 F.3d at 602.

### 1.  Section 2244(b)(2)(B)(i)

Petitioner's argument in Claim Two does not satisfy § 2244(b)(2)(B)(i). The Superior Court decided *Hubbard* in 2011, yet Petitioner waited until 2015 to raise the issue in the Delaware state courts and until 2019 to raise the issue in his successive Petition. Additionally, the argument presented in *Hubbard* – that rape cannot constitute the harm element for kidnapping – has been available to Petitioner since he was convicted in 1985. He has not provided any reason for not raising this argument earlier. Thus, the Court concludes that Petitioner has not satisfied the diligence requirement of § 2244(b)(2)(B)(i).

### 2.   Section 2244(b)(2)(B)(ii)

Petitioner's second argument also fails to satisfy 2244(b)(2)(B)(ii). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623 (1998).  Claim Two asserts an argument that the evidence presented at trial was legally insufficient to support his conviction for first degree kidnapping based on a subsequent interpretation of a legal innocence, not actual innocence.   Therefore, Claim Two fails to satisfy the requirements of § 2244(b)(2)(B)(ii).

Based on the foregoing, the Court will dismiss Petitioner's second and successive Petition for lack of jurisdiction.

## VI.   ONE-YEAR STATUTE OF LIMITATIONS

Even if the Petition was not successive, and the Court had the authority to grant relief, the Court would dismiss the Petition as time-barred.  The AEDPA prescribes a one-year period of limitations for the filing of habeas petitions by state prisoners, which begins to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). AEDPA's limitations period is subject to statutory and equitable tolling, which, when applicable, may extend the filing period. *See Holland v. Florida*, 560 U.S. 631, 645 (2010) (equitable tolling); 28 U.S.C. § 2244(d)(2) (statutory tolling). A petitioner may also be excused from failing to comply with the limitations period by making a gateway showing of actual innocence. *See Wallace v. Mahanoy*, 2 F. 4th 133, 151 (3d Cir. 2021) (actual innocence exception).

Petitioner asserts that May 15, 2015 (the date of the USDOJ's letter forwarding a copy of the letter it sent to the Delaware Department of Justice) constitutes the starting date for Claim One under § 2244(d)(1)(D). The Court is not persuaded. The record reveals that the first letter Petitioner received from the USDOJ was dated September 12, 2014, and that he had drafted a *pro se* Rule 61 motion based on that letter by September 17, 2014. (D.I. 11-18 at 118-121). Given these circumstances, the Court views September 17, 2014 as the relevant starting date under § 2244(d)(1)(D). Applying the one-year limitations period to that date, Petitioner had until September 17, 2015 to timely file Claim One. *See Wilson v. Beard*, 426 F.3d 653, 662-64 (3d Cir. 2005) (Fed. R. Civ. P. 6(a) applies to AEDPA's limitations period); *Phlipot v. Johnson*, 2015 WL 1906127, at *3 n.3 (D. Del. Apr. 27, 2015) (AEDPA's one-year limitations period is calculated according to the anniversary method, *i.e.*, the limitations period expires on the anniversary of the date it began to run).

As for Claim Two, the Court assumes, without deciding, that the starting date for the limitations period is the date of the *Hubbard* decision – September 29, 2011. *See* § 2244(d)(1)(D). Which would mean that Petitioner had until October 1, 2012[6] to file Claim Two in a timely manner.

---

[6] The last day of the limitations period fell on Saturday September 29, 2012.

Petitioner, however, did not file the instant Petition until September 3, 2019,[7] almost four full years after the deadline for Claim One and approximately seven years after the deadline for Claim Two.  Therefore, both Claims are time-barred unless the limitations period can be statutorily or equitably tolled, or Petitioner demonstrates a convincing claim of actual innocence excusing his untimely filing.

The Court will discuss each doctrine in turn.

A.    <u>Statutory Tolling</u>

Pursuant to § 2244(d)(2), a properly filed state post-conviction motion tolls AEDPA's limitations period during the time the motion is pending in the state courts, including any post-conviction appeals, provided that the motion was filed and pending before the expiration of AEDPA's limitations period.  *See Swartz v. Meyers*, 204 F.3d 417, 420-24 (3d Cir. 2000).  An untimely post-conviction motion is not considered to be properly filed for § 2244(d)(2) purposes. *See Pace v. DiGuglielmo*, 544 U.S. 408, 414, 417 (2005) (explaining that a state postconviction petition rejected by the state court as untimely is not "properly filed" within the meaning of § 2244(d)(2)).  The limitations period is also tolled for the time during which an appeal from a post-conviction decision could be filed even if the appeal is not eventually filed.  *See Pace*, 544 U.S. at 424.  The limitations period, however, is not tolled during the ninety days a petitioner has to file a petition for a writ of certiorari in the United States Supreme Court regarding a judgment denying a state post-conviction motion.  *See Stokes v. Dist. Attorney of Philadelphia*, 247 F.3d 539, 542 (3d Cir. 2001).

---

[7]    The Court adopts September 3, 2019 as the filing date, because that is the date on which Petitioner signed his motion for permission to file a second or successive petition.  (D.I. 1-1 at 5); *see Longenette v. Krusing*, 322 F.3d 758, 761 (3d Cir. 2003) (the date on which a prisoner transmitted documents to prison authorities for mailing is to be considered the actual filing date).

Petitioner filed his second Rule 61 motion in the Superior Court on June 12, 2015.  Since the one-year limitations period for Claim Two expired on October 1, 2012, the Rule 61 motion does not have any statutory tolling effect for Claim Two.

As for Claim One, 268 days of the limitations period had already lapsed when Petitioner filed his second Rule 61 motion on June 12, 2015.  The Rule 61 motion tolled the limitations period through September 18, 2018, the date on which the Delaware Supreme Court denied Petitioner's request for rehearing *en banc*.  *See Lawrence v. Florida*, 549 U.S. 327, 329 (2007).  The limitations clock started to run again on September 19, 2018,[8] and ran the remaining ninety-seven days until the limitations period expired on December 26, 2018.[9]

Consequently, even with the applicable statutory tolling, both Claims One and Two are time-barred, unless equitable tolling or the actual innocence exception apply.

**B.      Equitable Tolling and Actual Innocence Exception to the Statute of Limitations**

AEDPA's one-year limitations period may be tolled for equitable reasons in rare circumstances when the petitioner demonstrates "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649-50.  With respect to the diligence inquiry, equitable tolling is not available where the late filing is due to the petitioner's excusable neglect.  *Id.* at 651-52.  As for the extraordinary circumstance requirement, "the relevant inquiry is not whether the circumstance alleged to be extraordinary is unique to the petitioner, but how severe an obstacle it creates with

---

[8]      The limitations period was not tolled during the pendency of Petitioner's petition for writ of certiorari in the United States Supreme Court.  *See Lawrence v. Florida*, 549 U.S. 327, 329 (2007).

[9]      The limitations period actually expired on December 25, 2018, a federal holiday. Therefore, the limitations period extended through the end of the day on December 26, 2018.  *See* Fed. R. Civ. P. 6(a)(2)(C).

respect to meeting AEDPA's one-year deadline." *Pabon v. Mahanoy*, 654 F.3d 385, 401 (3d Cir. 2011).  An extraordinary circumstance will only warrant equitable tolling if there is "a causal connection, or nexus, between the extraordinary circumstance [] and the petitioner's failure to file a timely federal petition." *Ross v. Varano*, 712 F.3d 784, 803 (3d Cir. 2013); *see also Wallace v. Mahanoy*, 2 F.4th 133, 144 (3d Cir. 2021) (reiterating that the relevant inquiry for purposes of assessing extraordinary circumstances is "how severe an obstacle [the circumstance] creates with respect to meeting AEDPA's one-year deadline.").  Moreover, "if the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing." *Brown v. Shannon*, 322 F.3d 768, 773 (3d Cir. 2003).  The burden is on the petitioner to prove that he has been reasonably diligent in pursuing his rights. *See Urcinoli v. Cathel,* 546 F.3d 269, 277 (3d Cir. 2008).

In addition, a credible claim of actual innocence may serve as an "equitable exception" that can overcome the bar of AEDPA's one-year limitations period.  *See McQuiggin*, 569 U.S. at 392; *Wallace*, 2 F. 4th at 150-151.  A petitioner satisfies the actual innocence exception by (1) presenting new, reliable evidence of his innocence; and (2) showing "by a preponderance of the evidence" that "a reasonable juror would have reasonable doubt about his guilt[] in light of the new evidence." *Wallace*, 2 F. 4th at 151.

Petitioner does not assert that any extraordinary circumstance prevented him from filing Claim One within one year of receiving the first USDOJ letter or from filing Claim Two within one-year of the *Hubbard* decision.  Nor has Petitioner demonstrated that he exercised reasonable diligence in presenting Claims One and Two to this Court.  With respect to Claim One, as

previously discussed, the Forensic Science Associates report issued in April 2003 on Petitioner's behalf identified numerous errors in the Special Agent's testimony that were similar to the errors identified by the USDOJ in 2015. (*See* D.I. 11-18 at 51-54). Yet, Petitioner does not explain why he waited until 2019 to file the instant Petition. As for Claim Two, Petitioner has not provided any explanation for waiting more than seven years after the *Hubbard* decision to seek habeas relief. Petitioner's unexplained delays suggest that he did not exercise the diligence necessary to trigger equitable tolling.

To the extent Petitioner asserts that he should be excused from complying with the limitations period for Claim One because the information provided in the USDOJ's May 2015 letter demonstrates his actual innocence, his argument is unavailing. At most, the USDOJ's May 2015 letter provides a reason for inquiring into the identification of Petitioner as the victim's attacker – the information, on its own, does not prove his actual innocence. Significantly, the DNA testing result from the Forensic Science Associates 2003 report links Petitioner to the crimes for which he was convicted and directly disproves his claims of innocence for the rape conviction. Petitioner's argument in Claim Two that the evidence presented at trial was legally insufficient to satisfy the harm element for first degree kidnapping also does not establish his factual innocence. *See Bousley*, 523 U.S. at 623 ("[A]ctual innocence means factual innocence, not mere legal insufficiency.").

Based on the forgoing, the Court concludes that neither the doctrine of equitable tolling nor the actual innocence equitable exception are available to Petitioner on the facts he has presented. Accordingly, even if the instant Claims were not barred as second or successive, they would be dismissed as time-barred.

## VII.    CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  If a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling.  *Id.*

The Court has concluded that the instant Petition fails to warrant federal habeas relief, and is persuaded that reasonable jurists would not find this conclusion to be debatable.  Therefore, the Court will not issue a certificate of appealability.

## VIII.    CONCLUSION

For the reasons stated, the Court will dismiss the instant successive Petition because both Claims are barred by 28 U.S.C.§ 2244(b)(2)(B)(ii).  The Court declines to issue a certificate of appealability.  An appropriate Order shall issue.